UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL G. BLACKBURN,            )        Case No.  1:15CV1398
                                 )
                 Plaintiff,      )        JUDGE BENITA Y. PEARSON
                                 )        Magistrate George J. Limbert
        v.                       )
                                 )
CAROLYN W. COLVIN[1],            )        REPORT & RECOMMENDATION OF
COMMISSIONER OF                  )        MAGISTRATE JUDGE
SOCIAL SECURITY,                 )
                                 )
                 Defendant.      )


Plaintiff Michael G. Blackburn ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  ECF Dkt. #1.  Plaintiff challenges the Administrative Law Judge's ("ALJ") Step Three finding that his spine disorders ("DDD") did not meet or medically equal Listing 1.04A and the ALJ's evaluation of the opinion of his treating physician.  *Id.* For the following reasons, the undersigned recommends that the Court REVERSE the ALJ's decision and REMAND this case to the ALJ for further factfinding, analysis and articulation as to whether Plaintiff's back impairments, individually, or in combination with his other impairments, meet or medically equal Listing 1.04A.

## I.      PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI in March 2012 alleging disability beginning January 13, 2012 due to lumbar stenosis, spinal stenosis, cervical stenosis, right hip degenerative

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

arthritis, degenerative disc disease ("DDD") in the back, right ankle arthritis, and depression.  ECF Dkt. #11 at 191-221.  The Social Security Administration ("SSA") denied Plaintiff's applications initially and upon reconsideration.  *Id.* at 130-148.  Plaintiff requested a hearing before an ALJ which was held on October 15, 2013.  *Id.* at 38, 149.

On January 22, 2014, the ALJ issued a decision finding that Plaintiff had the severe impairments of status post laminectomy and spinal fusion of the thoracic spine, lumbar stenosis, cervical stenosis, femoroacetabular impingement syndrome, and degenerative changes of the right foot. ECF Dkt. #11 at 27.  The ALJ further found that none of Plaintiff's severe impairments, either individually or in combination, met or equaled a listed impairment in 20 C.F.R. Part 4, Subpart P, Appendix 1.  *Id.* at 30.  She found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: standing/walking up to four hours per eight-hour workday; sitting up to six hours of an eight-hour workday; no climbing of ladders, ropes or scaffolds; only occasional balancing and crouching; no crawling; frequent pushing and pulling with the right lower extremity; and the avoidance of even moderate exposure to hazards like industrial machinery and unprotected heights.  *Id.* at 30-31.  Based upon this RFC, the ALJ  found that Plaintiff could not return to his past relevant work, but, relying upon the testimony of the vocational expert ("VE"), he had transferable skills and could perform other jobs existing in significant numbers in the national economy, such as the representative occupations of unskilled light assembler of small products, unskilled light assembler of electrical accessories, and unskilled light electric worker.  *Id.* at 34-35.

Plaintiff filed a request for review of the ALJ's decision to the Appeals Council, but the Appeals Council denied his request for review.  Tr. at 1-12.  The ALJ's decision therefore became the final decision of the Commissioner.

Plaintiff appealed the decision to this Court on July 14, 2015.  ECF Dkt. #1.  Judge Pearson referred the case to the undersigned thereafter.  Plaintiff filed his brief on the merits on December 4, 2015, and Defendant filed her brief on the merits on February 23, 2016.  ECF Dkt. #s 13, 16.

## II.  SUMMARY OF RELEVANT MEDICAL EVIDENCE

On June 3, 2011, Plaintiff presented to Dr. Greenwald as a new patient for follow-up of his medical problems.  ECF Dkt. #11 at 356.  Dr. Greenwald noted that Plaintiff stated his medical history which included a right hip surgery in 2007 and he was experiencing hip pain following a motor vehicle accident.  *Id.*  He also described right leg/knee pain and that his leg would "give out" which had caused him to fall 3-4 times over the last several months.  *Id.*  He also indicated that he had constant pain, but no numbness or burning sensation in his leg.  *Id.*  Physical examination showed full cervical range of motion, normal extremities, no edema, normal pulses and intact sensation.  *Id.*  Dr. Greenwald did note decreased sensation of the leg and DDD of the lumbar spine.  *Id.* at 357.  She prescribed Motrin 800 mg and ordered lab work.  *Id.*

On July 13, 2011, a lumbar spine MRI showed moderate degenerative and facet disease exacerbated by a developmentally short pedicles, which resulted in multilevel moderate to severe neural foraminal stenosis, with stenosis most severe at L3-L4.  ECF Dkt. #11 at 402.  It was noted that L1-L2 "is notable due to left sided extruded free fragment filling the left lateral recess extending through the left neural foramen."  *Id.*

On July 22, 2011, Plaintiff presented to Physical Therapist Amy Bell for a spine evaluation.  ECF Dkt. #11 at 360.  Plaintiff described his history as including breaking his right ankle in 1998 or 1999 after a motorcycle accident with 100% recovery.  *Id.*  He related that in 2000, he started experiencing ankle pain and in 2001 he had surgery, which did not help.  *Id.*  He then started to feel right thigh pain in 2007 and x-rays showed a congenital hip deformity on the right and he had hip

surgery to correct it.  *Id.*  Plaintiff related that his right leg pain never improved.  *Id.*  He described several episodes of falling, with weakness and pain in his right leg, and he indicated that he had to lean on objects during the day to get the pressure off of his right leg or he would fall down.  *Id.*  Plaintiff's rehabilitation potential was evaluated as poor to fair due to the chronicity and extent of his problems. *Id.* at 365-366.  Therapy goals were set.  *Id.* at 366.

On July 26, 2011, Plaintiff presented to Dr. Yonan for pain management of his low back and right leg.  ECF Dkt. #11 at 373.  Dr. Yonan referred to the July 13, 2011 MRI of the lumbar spine which showed low back pain with radiculopathy.  *Id.* at 374.  Upon his own clinical examination and review of the July 13, 2011 MRI, Dr. Yonan opined that Plaintiff had moderate degenerative disc and facet disease exacerbated by developmentally short pedicles.  *Id.* at 375.  He noted that this resulted in multilevel moderate to severe neural foraminal stenosis, with spinal canal stenosis worst at L3-L4. *Id.*  He also noted that L1-L2 "is notable due to left sided extruded free fragment filling the left lateral recess extending through the left neural foramen."  *Id.*  He diagnosed Plaintiff with spinal stenosis in the lumbar region, most severe at L3-L4, lumbar DDD at L4-L5, left extremity radiculopathy, thoracic or lumbosacral neuritis or radiculitis, degeneration of the lumbar or lumbosacral intervertebral disc, and ankle and foot joint pain.  *Id.* at 376.  Dr. Yonan recommended aggressive physical therapy and injections, and counseled Plaintiff regarding Tramadol and Flexeril and his activities.  *Id.*  He administered injections on the same date.  *Id.* at 378.

On July 29, 2011, Plaintiff underwent a lumbar epidural steroid injection at L3-L4.  ECF Dkt. #11 at 382.

Plaintiff presented to Dr. Hsia, a spine specialist, on August 9, 2011 for his hip, leg and back pain. ECF Dkt. #11 at 385.  Plaintiff explained that the L3-L4 injections helped 75% of the leg pain, but the pain came back along with the back pain and he described it a throbbing and aching, which

was worse with activity.  *Id*.  He noted that he stopped physical therapy because it worsened his symptoms.  *Id.*  Musculoskeletal examination showed no joint pain or swelling, some low back pain, decreased flexion, extension and bending in the lumbar spine, an antalgic gait, decreased toe and heel walking, tenderness in the lumbar paraspinals, normal strength, negative straight leg raise, decreased hip range of motion, groin tenderness and normal knee range of motion.  *Id*. at 387-389.  Dr. Hsia assessed lumbar stenosis, rule out supervening hip impingement, and hyperflexia/balance issues with a rule out of cervical stenosis.  *Id*. at 389.  He recommended a second spinal injection, the resuming of physical therapy, a cervical MRI and an evaluation by Dr. Brooks for hip pain.  *Id*.

August 10, 2011 x-rays of Plaintiff's right hip showed postsurgical and probable posttraumatic changes about the right hip.  ECF Dkt. #11 at 349.

On August 12, 2011 and August 26, 2011, Plaintiff presented to Dr. Yonan for lumbar injections.  ECF Dkt. #11 at 393-399.

On September 6, 2011, Plaintiff presented to Dr. Yonan for evaluation of his back pain.  ECF Dkt. #11 at 400.  He indicated that he had experienced relief from the leg pain following the injections and had become more mobile.  *Id*.  He indicated that his symptoms were improving.  *Id*.  Physical examination revealed some minimal tenderness over the lower left lumbar facet and back.  *Id*.  Dr. Yonan discussed medication management and injections and added Tylenol with codeine for severe pain at the end of the day since Plaintiff had extensive facet degenerative change compared to his age and could not quit his job because he needed the money and it was a physical job.  *Id*. at 403-404.

Records show that on October 22, 2011, Plaintiff presented to the emergency room for a follow up of his acute chronic lumbar pain secondary to spinal stenosis.  ECF Dkt. #11 at 279.  He cursed at the staff, telling them that they "didn't do shit" for him and the doctor tried to explain that Plaintiff had chronic pain, no evidence of cord compression and no mechanism for fracture.  *Id*. At 298.  The

doctor explained to Plaintiff that he was prescribed Tramadol for his pain at the first visit and if the medication did not work, Plaintiff would not have refilled it three successive times.  *Id*.  Plaintiff informed the doctor that he presented to the emergency room because while he always had some level of back pain with his spinal stenosis, he came because he woke up, the pain felt worse, and he fell down when trying to get out of bed because his legs would not work.  *Id*.  Plaintiff denied numbness/tingling to the legs, and the clinical examination showed no tenderness in the neck, equal strength in the bilateral upper and lower extremities and intact sensation therein, with normal reflexes, negative straight leg raise, and the ability to work on his toes and heels.  *Id*. at 299.  Plaintiff did have midline back tenderness.  *Id*.  The doctor diagnosed acute chronic back pain secondary to lumbar spinal stenosis and prescribed Tramadol again.  *Id*. at 300.

On November 9, 2011, Plaintiff presented to Dr. Hsia for follow up and Plaintiff reported that he met with Dr. Brooks for his hip pain and was told that he was considered for right hip resurfacing.  ECF Dkt. #11 at 407.  He complained of immediate low back and right buttock/thigh pain with standing and right leg giving out at times.  *Id*.  He reported that he stopped physical therapy due to worsening symptoms but he had significant relief for weeks after injections.  *Id*.  Dr. Hsia noted a lumbar MRI showing diffuse moderate loss of intervertebral disc at every level; with chronic right L5 pars fracture; narrowed spinal canal and neural foramina due to short pedicles; L1-L2 spinal canal narrowing due to broad-based disc extrusion with a focal left-sided free fragment filling the left lateral recess, mild right neural foraminal stenosis and moderate left neural foraminal stenosis; mild narrowing at L3-L4 with moderate right neural foraminal stenosis; severe spinal canal stenosis at L3-L4 due to a central disc extrusion and marked hypertrophic changes in the facet joints with moderate severe neural foraminal stenosis; mild to moderate narrowing at L4-L5; and bilateral moderate  severe

neural foraminal stenosis.  *Id.* at 408.  Clinical examination showed decreased flexion, extension and range of motion in the lumbar spine, an antalgic gait, decreased toe and heel walking, normal sensation, and lumbar paraspinals tenderness.  *Id.* at 409.  He diagnosed lumbar canal stenosis and right hip pathology.  *Id.*  He suspected that Plaintiff's hip problems were a combination of the lumbar stenosis and hip pathology and he recommended a second opinion from a spine surgeon.  *Id.*  Dr. Hsia advised Plaintiff to use a cane.  *Id.*

On February 1, 2012, Plaintiff presented to Dr. Hsia and indicated that he did not seek a spine surgery consultation and he was undecided about hip surgery.  ECF Dkt. #11 at 413.  He related that his low back pain had worsened and thigh/buttock pain worsening with immediate standing and walking.  *Id.*  Plaintiff was walking with crutches and had been off of work for the last week.  *Id.*  He indicated that he went to the emergency room for his pain and was given Vicodin which did not help. *Id.*  Physical examination showed positive lumbar paraspinal tenderness, severely decreased lumbar and hip ranges of motion, slow gait and a very poor effort on knee/ankle flexion.  *Id.* at 414-415.  Dr. Hsia diagnosed lumbar canal stenosis, right hip arthritis, depression, Waddells 3/5, a significant myofascial component to Plaintiff's pain and very poor mobility.  *Id.* at 415.  Dr. Hsia ordered a lumbar MRI and cervical MRI and prescribed Vicodin for the short term and Cymbalta.  *Id.*  Dr. Hsia ordered Plaintiff off of work and scheduled him for a repeated lumbar injection and recommended a surgical consult.  *Id.*

A February 10, 2012 cervical MRI showed facet and uncinate joint hypertrophy at C3-C4 which resulted in severe left and moderate right foraminal narrowing; C4-C5 disc osteophyte complex, facet, and uncinate joint hypertrophy resulting in mild flattening of the left ventral cord and severe bilateral foraminal stenosis; C5-C6 disc osteophyte complex, facet, and uncinate joint hypertrophy

resulting in severe bilateral foraminal narrowing and moderate flattening ventral cord; C6-C7 disc osteophyte complex, facet, and uncinate joint hypertrophy resulting in moderate flattening of the left ventral cord and severe left foraminal narrowing. ECF Dkt. #11 at 418. The lumbar spine MRI showed multilevel degenerative changes within the lumbar spine with a developmentally narrowed canal and severe L3-L4 canal stenosis. *Id*. at 419.

On February 27, 2012, Plaintiff presented to Dr. Saeed at the pain management center for the evaluation of his back and bilateral lower extremity pain. ECF Dkt. #11 at 422. Plaintiff reported sleep problems and he rated his pain as 7 out of 10. *Id.* Physical examination showed no back pain to palpation, good flexion and extension, normal motor and sensory exams and negative straight leg raising. *Id*. Dr. Saeed diagnosed spinal stenosis of the lumbar spine without neurogenic claudication, displacement of the lumbar intervertebral disc without myelopathy and lumbosacral neuritis or radiculitis. *Id.* at 423. He recommended injections, physical therapy, the consideration of surgical options, the consideration of behavioral medicine consultation and the continuance of pain medications prescribed by Dr. Hsia. *Id.*

On March 1, 2012, Plaintiff presented to the emergency room complaining of back pain that was causing numbness in his legs. ECF Dkt. #11 at 321-322. He described the pain as a 9 out of 10 with a sharp stabbing on the left side that radiated numbness into his legs. *Id*. at 322. He explained that he had chronic low pain which was getting worse even though he was receiving treatment for pain management and spinal injections. *Id.* at 323. The musculoskeletal examination showed that Plaintiff had a normal gait, strength and muscle tone, with a paraspinous lumbar spasm, no midline tenderness, normal heel and toe walking, but positive straight leg raise on the left side. *Id*. He was diagnosed with spinal stenosis, lumbar DDD, and lumbar disc displacement with radiculopathy. *Id*. at 328. Plaintiff

was prescribed Prednisone, Percocet and Flexeril. *Id*. at 329.

On February 10, 2012, Plaintiff underwent a cervical and lumbar spine MRI which showed multilevel degenerative changes within the lumbar spine with a developmentally narrowed canal, severe L3-L4 canal stenosis, and multilevel cord flattening in the cervical spine, most severe at C5-C6. ECF Dkt. #11 at 339.

On March 8, 2012, Plaintiff followed up with Dr. Hsia and reported an episode where his legs felt paralyzed when he was in the shower and they gave out on him. ECF DKt. #11 at 427. Plaintiff related that he still had not returned to work because he was afraid of falling and he was thinking about applying for disability. *Id*. Physical examination showed decreased ranges of motion and decreased flexion, extension and bending, decreased heel and toe walking, tenderness to the lumbar paraspinals, normal sensation and negative straight leg raise. *Id.* at 429-430. He diagnosed Plaintiff with lumbar stenosis, hip arthritis, obesity and cervical stenosis. *Id*. at 430. Plaintiff indicated that he was taking 3-4 Percocet per day which was helping with the pain and Dr. Hsia wrote a letter to Plaintiff's employer keeping him off of work. *Id.*

On March 12, 2012, Plaintiff presented to Dr. Rickson at the emergency room complaining of traumatic knee and ankle pain after he fell. Tr. at 303-304. He described the pain a 3 out of 10 with constant sharp and aching pain. *Id*. at 304. Plaintiff noted a prior ankle surgery and explained that he had spinal stenosis and did not have complete control over his right leg which caused him to fall and injure his right foot and ankle. *Id*. He also complained of chronic back pain. *Id.* A clinical examination showed tenderness of the distal first metatarsal and medial ankle tenderness. *Id*. at 305. X-rays of the right knee showed calcific density adjacent to the medial femoral condyle, which appeared to be more suggestive of a nonacute process such as Plaintiff's prior injury, although

correlation was recommended. *Id.* at 306. X-rays of the right foot showed severe degenerative changes at the mid and hindfoot with a stable appearance. *Id*. at 307-308. Right ankle x-rays showed no significant changes from the prior x-rays of the right ankle. *Id*. at 308. He was diagnosed with contusion of the right ankle and foot and ankle sprain. *Id*. at 312-314.

Plaintiff presented to Dr. Krishnaney on March 14, 2012 upon referral by Dr. Hsia for his gait instability and lower extremity numbness. ECF Dkt. #11 at 436. Upon review of the MRIs and physical examination, Dr. Krishnaney opined that Plaintiff had multiple issues affecting his cervical, thoracic and lumbar spine, as well as his hip. *Id.* at 437. He indicated that Plaintiff appeared to be myelopathic based upon clinical examination even though the sensory level indicated a thoracic level pathology. *Id*. He recommended that Plaintiff proceed with spinal injections and ordered a thoracic MRI. *Id.*

A March 21, 2012 thoracic spine MRI showed T2-T3 cord compression with spinal cord edema secondary to disc herniation and congenitally narrow spinal canal and multilevel degenerative spondylosis with multiple disc protrusions superimposed on a congenitally narrow central canal. ECF Dkt. #11 at 342.

On May 1, 2012, Dr. Hsia examined Plaintiff and completed his disability paperwork. ECF Dkt. #11 at 491. Plaintiff told Dr. Hsia that the spine surgeon recommended that he have surgery for myelopathy/thoracic stenosis. *Id.* Plaintiff also related that he was taking 2-3 Percocet per day which helped with the pain. *Id*. Dr. Hsia conducted a physical examination which showed decreased lumbar range of motion, an antalgic gait, decreased toe and heel walking, and positive tenderness in the lumbar paraspinals. *Id*. at 494-495. He diagnosed lumbar stenosis, thoracic stenosis with myelopathy and he completed the disability paperwork. *Id*. at 495. He refilled Plaintiff's Percocet and reminded

him to follow up with Dr. Krishnaney for consideration of thoracic surgery.  *Id.*

On May 31, 2012, Plaintiff underwent a psychological evaluation by Psychologist Spindler. ECF Dkt. #11 at 499.  He was diagnosed with depressive disorder, not otherwise specified, and cannabis abuse, and rated Plaintiff a global assessment of functioning score of 60, indicative of moderate symptoms.  *Id*. at 503.  Dr. Spindler found Plaintiff capable of understanding, remembering and executing instructions in most job settings, capable of sufficient concentration and attention for most job settings, and capable of responding appropriately to supervisors and co-workers and to work pressures in the work setting.  *Id.* at 504.

On July 27, 2012, Plaintiff presented to Dr. Krishnaney for a consultation.  ECF Dkt. #11 at 566.  Plaintiff reported that he was feeling much worse, with persistent back and right leg pain, as well as new left leg pain.  *Id*.  Physical examination revealed no pain in the paraspinals, increased muscle tone, normal sensory and motor examinations, and a spastic gait.  *Id*. Dr. Krishnaney diagnosed T2-T3 cord compression with spinal cord edema secondary to disc herniation and congenitally narrow spinal canal.  *Id.*  He discussed surgery with Plaintiff and Plaintiff consented to a T2-T3 decompression and discectomy via right-sided transpedicular approach.  *Id*. at 567.

August 9, 2012 thoracic spine CT scans showed degenerative changes.  ECF Dkt. #11 at 616.

On October 2, 2012, Plaintiff underwent T2-T3 laminectomies with a right-sided transpedicular diskectomy and posterior spinal fusion with instrumental arthrodesid from T2 through T4 and use of local bone autograft. ECF Dkt. #11 at 592.  He was discharged on October 6, 2012, but began complaining of chest pain so he was transferred to another floor of the hospital.  *Id*. at 590. Plaintiff also complained of chronic pain in all of his extremities and chronic back pain.  *Id*. at 508. After a pulmonary embolism and heart problems were ruled out, he was transferred to acute

-11-

rehabilitation.  *Id.* at 590.  He was diagnosed with myelopathy/chronic pain syndrome/status post thorlaminectomy, smoker, obesity, and deep venous thrombosis prophylaxis.  *Id.* at 509-510.  A left lobe infiltrate was found on October 8, 2012 and a right new infiltrate secondary to atelectasis.  *Id.* at 511.  He was treated and stabilized, but was having problems with daily living activities and mobility so he was placed in a rehabilitation unit thereafter.  *Id.*  A two-week stay was anticipated in the unit. *Id.* at 515.

On December 7, 2012, Plaintiff presented to Dr. Krishnaney for follow up of his laminectomies.  ECF Dkt. #11 at 597.  He rated his back and right leg pain at 6-7 out of 10.  *Id.*  Upon physical examination, Dr. Krishnaney noted that Plaintiff had an improving gait and he was ordered to physical therapy with a graded return to full activity.  *Id.* at 598.

On February 26, 2013, Plaintiff presented to Dr. Matko for his progressively worsening left hip pain which was making it difficult to walk and move without significant pain.  ECF Dkt. #11 at 560.  He also complained of back pain.  *Id.*  Physical examination revealed mild lumbar spine tenderness to palpation, no right or left hip greater trochanteric tenderness, but left hip and groin discomfort with left hip internal and external rotation.  *Id.* at 560-561.  X-rays were reviewed which showed no fractures or dislocations, and no evidence of osteophytic formation.  *Id.* at 561.  Dr. Matko's diagnosis was left hip pain secondary to femoroacetabular impingement syndrome.  *Id.*

Dr. Scullin gave Plaintiff sciatic nerve blocks on March 12, 2013.  ECF Dkt. #11 at 655.

An April 16, 2013 x-ray of the thoracic spine showed postoperative changes of the posterior fusion extending from T2 through T4 with posterior decompression.  ECF Dkt. #11 at 600.  The surgical hardware appeared intact with the thoracic spine vertebral body heights maintained, with mild to moderate degenerative changes noted throughout the thoracic spine, greater in the lower thoracic

spine. *Id.* Plaintiff followed up with Physician Assistant Wilson regarding his laminectomies and he complained of cervical, shoulder, and hip pain. *Id.* at 601. Plaintiff did report significant improvements with his strength and mobility. *Id.* Physical examination showed normal ranges of motion in the extremities and in the hips, but Plaintiff still had an abnormal gait and difficulty with dorsiflexion. *Id.* at 602. It was noted that Plaintiff's bilateral lower extremity weakness had markedly improved. *Id.*

August 15, 2013 thoracic spine CT scans showed postoperative changes from a posterior spinal fusion from T2 through T4 with metal hardware in place. ECF Dkt. #11 at 656. Mild spinal canal stenosis was noted at T5-T6, T6-T7 and T8-T9, as well as degenerative bone spurring throughout the thoracic spine and no osteolytic or osteoblastic lesions. *Id.*

A September 3, 2013 MR hip arthrogram showed subchrondral cyst and chondromalacia in the anterior superior acetabular with advanced degeneration and attrition of the anterior superior labrum and capsular thickening; abnormal morphology of the superior lateral femoral neck consistent with CAM type impingement; and moderate chondromalacia of the anterior superior labrum. ECF Dkt. #11 at 1031.

Dr. Scullin ordered nerve conduction studies on September 14, 2013 which were limited by Plaintiff's obesity and she diagnosed severe bilateral L5-S1 radiculopathy and no evidence of lower extremity neuropathy. ECF Dkt. #11 at 1012.

On September 17, 2013, Dr. Scullin completed a medical source statement indicating that she began treating Plaintiff on October 8, 2012 and examined him every 1 to 2 months. ECF Dkt. #11 at 1013. She diagnosed cervical thoracic myelopathy, low back pain with radiculopathy, neuritis and neuropathy. *Id.* She opined that his prognosis was poor and his symptoms included chronic thoracic and low back pain, fatigue, and difficulty with ambulation and daily living activities. *Id.* She indicated that he treated with physical therapy, caudal blocks, surgery and medications. *Id.* She

opined that Plaintiff could walk no blocks without rest or severe pain, he could sit and stand for only five minutes at a time for a total of less than two hours per eight-hour workday, he needed a sit/stand option, periods of walking around every five minutes for three minutes each time, and he would have to take unscheduled breaks every half hour for up to twenty minutes due to muscle weakness, pain and chronic fatigue.  *Id.* at 1014.  She also noted that Plaintiff needed to use a cane due to imbalance, pain and weakness, he could never lift any weight, could never twist, stoop, bend, crouch, squat, climb stairs or climb ladders.  *Id.* at 1015.  She opined that Plaintiff would be off task 25% or more of the typical workday, he was incapable of even low stress work, and would be absent more than four days per month due to treatment or his impairments.  *Id.* at 1016.

A September 25, 2013 lumbar spine MRI showed marked multilevel degenerative changes of the lumbar spine with degenerative disease at all levels: a large left paracentral/foraminal disc protrusion at the L1-L2 level is seen causing indentation of the dural sac and L2 nerve root; a moderate broad based disc protrusion right foraminal and extra foraminal at the L2-L3 level causing indentation of the dural sac and right L3 nerve root; mild to moderate canal stenosis at the L1-L2 level, L2-L3 and L3-L4 levels, and marked canal stenosis at the L3-L4 level .  ECF Dkt. #11 at 1017.

On October 1, 2013, Plaintiff presented to Dr. Robertson, an orthopedist, regarding his hip pain and test results.  ECF Dkt. #11 at 1036.  Dr. Robertson recommended surgical treatment, preferably through arthroscopy.  *Id.* at 1037.

### III.    SUMMARY OF TESTIMONY

On October 15, 2013,  the ALJ held a hearing at which Plaintiff, represented by counsel, and a VE, testified.  ECF Dkt. #11 at 40.  Plaintiff explained that he last worked in January of 2011 at an auto body shop doing collision repair and refinishing.  *Id.* at 42-43.  He explained that the last few years of this job involved just sanding and prep work and spraying the paint since his physical condition began worsening.  *Id.* at 43.

Plaintiff indicated that he had been using crutches for the last two years because when he put pressure on his spinal cord, his legs would go weak and he would fall. ECF DKt. #11 at 52. He stated that one of his physicians recommended them and had prescribed him a wheelchair for long distances. *Id.* He explained that he could walk from the couch to the kitchen without assistive devices as long as he held onto objects like walls or tables. *Id.* at 54. He opined that he could stand for fifteen minutes to half an hour before he would fall, even with crutches. *Id.* at 56. He explained that he stopped driving about eight months ago because of the leg weakness as even when he is sitting, he has muscle spasms which weakens his legs. *Id.* He stated that he uses a seat in the shower, he needs help getting dressed, and he does none of the household chores. *Id.* at 57-58. He spends time watching television, lying down, and stretching. *Id.* at 59.

Upon questioning by his attorney, Plaintiff indicated that he has numbness and pain in both legs and he uses Fentanyl Duragesic patches, and takes Oxycodone, Valium, Gabapentin, Lexapro and Baclofen. ECF Dkt. #11 at 60. He identified drowsiness and light-headedness, constipation and memory problems as side effects. *Id.* He stated that he still suffered pain and had undergone a right hip surgery for a congenital deformity which was successful, but he began having left hip pain and was awaiting a consultation with another surgeon for that hip. *Id.* at 62. He also described a right foot surgery from 2002 and ongoing problems with his right foot and ankle. *Id.* at 63. He related that he cannot put on his own shoes and socks due to the pain of bending over and he needs help putting on his pants and underwear. *Id.* at 64.

The VE then testified. The ALJ presented a hypothetical person with Plaintiff's age, education and work background who could perform light work of standing/walking up to four hours per eight-hour workday and sitting of up to six hours per eight-hour workday, with no climbing of ladders, ropes or scaffolds, occasional balancing and crouching, never crawling, frequent pushing/pulling with the right lower extremity, and the avoidance of even moderate exposure to the hazards of industrial

machinery, unprotected height and similar items. ECF Dkt. #11 at 68-69. The VE testified that such a person could not perform Plaintiff's past relevant work, but he could perform a significant number of jobs existing in the national economy, including the occupations of assembler of small products, assembler of electrical accessories, and an electronics worker. *Id.* at 69.

Plaintiff's counsel modified the ALJ's hypothetical person to conform to the medical source statement provided by Dr. Scullin. ECF Dkt. #11 at 70. The VE testified that no jobs would be available for a person with such limitations. *Id.* Counsel then asked if the hypothetical person presented by the ALJ could perform the positions to which he testified if that person also required the bilateral use of a handheld assistive device for walking. *Id.* The VE testified that such a person could perform those positions, and such a person who used a handheld assistive device for standing could also perform such positions. *Id.* When asked if jobs were available for the hypothetical person who was off task 25% or more or who was absent more than four days per month, the VE responded that no jobs would be available. *Id.* at 71-72. While responding that restrictions on bending and stooping would not necessarily preclude the jobs he identified, the VE did indicate that all jobs would be precluded if a further restriction was included that such a hypothetical individual could never lift or carry 10 pounds or more. *Id.* at 72-73.

## IV.   STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to DIB and SSI. These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (§§20 C.F.R. 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (§§20 C.F.R. 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see §§20 C.F.R. 404.1509 and 416.909

-16-

(1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (§§20 C.F.R. 404.1520(d) and 416.920(d) (1992));

4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (§§20 C.F.R. 404.1520(e) and 416.920(e) (1992));

5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (§§20 C.F.R. 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).   The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and RFC.  *See Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

This Court's review of the ALJ's decision is limited in scope by § 205 of the Social Security Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Therefore, this Court is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).   Substantial evidence is more than a scintilla of evidence, but less than a preponderance.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).   It is evidence that a reasonable mind would accept as adequate to support the challenged conclusion.  *Id.*; *Walters,* 127 F.3d at 532.  Substantiality is based upon the record taken as a whole.  *Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365 (6th Cir. 1984).

-17-

## VI.    LAW AND ANALYSIS

### A.    STEP 3 AND LISTING 1.04A

Plaintiff first asserts that substantial evidence does not support the ALJ's Step Three finding that his spine disorders did not meet or medically equal Listing 1.04A.  ECF Dkt. #13 at 13-14.  The undersigned recommends that the Court find that the ALJ's Step Three analysis is insufficient and substantial evidence does not support the ALJ's determination that Plaintiff's impairments did not meet or medically equal Listing 1.04A.

The Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 describes impairments for each of the major body parts that are deemed of sufficient severity to prevent a person from performing gainful activity.  20 C.F.R. § 416.920.  In the third step of the analysis to determine a claimant's entitlement to social security benefits, it is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987).  In order to meet a listed impairment, the claimant must show that his impairments meet all of the requirements for a listed impairment.  *Hale v. Sec'y,* 816 F.2d 1078, 1083 (6th Cir. 1987).  An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

An impairment or combination of impairments is considered medically equivalent to a listed impairment "* * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments."  *Land v. Sec'y of Health and Human Servs.*, 814 F.2d 241, 245 (6th Cir.1986)(per curiam).  Generally, an ALJ should have a medical expert testify and give his opinion before determining medical equivalence.  20 C.F.R.§ 416.926(b).  In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to *all* the criteria for the one

most similar listed impairment." *Sullivan*, 493 U.S. at 531.

Listing 1.04 and 1.04A provide:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

Listing 1.04A.

The ALJ's Step Three analysis as to whether Plaintiff's impairments met or medically equaled Listing 1.04A consists of only the following:

> Finally, the undersigned considered section 1.04A.  While there is evidence of nerve root compression, as will be discussed below, the claimant's sensation and reflexes have generally been intact.

ECF Dkt. #11 at 30.  The ALJ therefore agreed that Plaintiff had spinal disorders and satisfied the nerve root compression part of the Listing.  *Id.*  Although she does not mention it, the ALJ apparently does not dispute that Plaintiff's nerve root compression was characterized by neuro-anatomic distribution of pain or limitation of motion of the spine.  *Id.*  Rather, the ALJ found that Plaintiff's sensation and reflexes were intact, thereby finding that the medical evidence did not establish that Plaintiff suffered motor loss accompanied by sensory or reflex loss, one of the latter parts of Listing 1.04A.  *Id.*

While the ALJ implied in her Step Three conclusion that later parts of her decision supported her finding that Plaintiff's sensation and reflexes were generally intact, the undersigned recommends that the Court find that the ALJ's did not adequately address these criteria in her decision.  The ALJ cited to two instances in the medical record where Plaintiff's sensations were found to be intact and

-19-

normal.  *Id.* at 27, citing ECF Dkt. #11 at 468; ECF Dkt. #11 at 28, citing ECF Dkt. #11 at 561. However, the records show a number of abnormal sensory exams concerning Plaintiff's T5, including documentation of such on August 9, 2012 and August 12, 2012 .  ECF Dkt. #11 at 585, 587.  Dr. Catcutan, who evaluated Plaintiff preoperatively on August 9, 2012, specifically noted that Plaintiff had abnormal decreased sensation from T5 down, and he had reflex abnormality.  *Id.* at 577.   Dr. Scullin, Plaintiff's treating physician, also noted decreased sensation to light touch and pin prick on October 18, 2012. ECF Dkt. #11 at 516.  Problems of decreased leg sensations were also documented by medical providers on February 1, 2012, May 1, 2012, June 27, 2012, August 9, 2012, August 30, 2012, and April 16, 2013.  *Id.* at 475, 496, 585, 587,588, 599, 603.   Moreover, diminished proprioceptions were noted in Plaintiff's feet on August 2, 2012, August 9, 2012, and August 30, 2012. *Id.*  An EMG and nerve conduction study also showed abnormal sensation on September 14, 2013.  *Id.* at 1011-1012.

In addition, the ALJ failed to cite to any medical evidence supporting her finding that Plaintiff's  reflexes were intact.  The medical record contains instances of abnormal reflex findings, including a medical note from Dr. Scullin, where she documented the absence of an Achilles reflex bilaterally and deep tendon reflexes of 1/4 on October 8, 2012 and October 18, 2012.  ECF Dkt. #11 at 511-518.  Moreover, the September 14, 2013 EMG and nerve conduction study showed abnormal motor responses.  *Id.* at 1011-1012.  Positive straight raising, the last portion of Listing 1.04A, was also found on Plaintiff's left side on March 1, 2012.  *Id.* at 323.

For these reasons, the undersigned recommends that the Court remand the instant case for the ALJ to more thoroughly consider and articulate whether Plaintiff's impairments meet Listing 1.04A.

In addition, even if Court finds that the ALJ adequately articulated her Step Three analysis that Plaintiff's impairments did not meet Listing 1.04A, the undersigned recommends that the Court find that the ALJ failed to adequately articulate her reasons for finding that Plaintiff's impairments,

individually or in combination, did not medically equal Listing 1.04A.  The ALJ already found that the evidence established a spinal disorder showing nerve root compression and the ALJ did not dispute that said nerve root compression was characterized by neuro-anatomic distribution of pain and limitation of motion of the spine.  ECF Dkt. #11 at 26-28.  The spinal disorders diagnosed in this case include status-post T2-T3 laminectomies with right-sided transpedicular diskectomy and posterior spinal fusion.  *Id.* at 590.  A September 23, 2013 MR left hip arthrogram showed a subchondral cyst and chondromalacia in the anterior superior acetabulum with advanced degernation and attrition of the anterior superior labrum and capsular thickening.  *Id*. at 1033.  It also showed abnormal morphology of the superior lateral femoral neck consistent with CAM type impingement.  *Id.*  Surgical treatment via arthroscopy was recommended and Plaintiff was to bear weight only as tolerated.  *Id*. at 1037.  A September 25, 2013 lumbar MRI also indicated marked multi-level degenerative changes of the lumbar spine with DDD at all levels, a large left paracentral/foraminal disk protrusion at L1-L2 causing indentation of the dural sac and right L3nerve root, and mild to moderate central stenosis at the L1-2, mild central stenosis at L2-L3, marked stenosis at L3-4 and moderate central at L4-L5.  *Id.* at 1018.

Some documentation of sensation loss and reflex loss exists in the record, as referenced above.  *Id*. at 323, 475, 496, 511-518, 577, 585, 587, 588, 599, 603, 1011, 1012.    And while some instances of normal and intact sensation and reflexes exist in the record, medical equivalence does not require that Plaintiff "meet" each criteria of Listing 1.04A.  Rather, Plaintiff need only present medical findings showing symptoms or diagnoses equal in severity and duration to the Listing.  20 C.F.R. § 404.1526(b)(1)(i) states that medical equivalence can be established by three ways:

(1)(i) If you have an impairment that is described in appendix 1, but—

(A) You do not exhibit one or more of the findings specified in the particular listing, or

(B) You exhibit all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

(ii) We will find that your impairment is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria.

(2) If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find that your impairment(s) is medically equivalent to the analogous listing.

(3) If you have a combination of impairments, no one of which meets a listing (see § 404.1525(c)(3)), we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing.

20 C.F.R. § 404.1526(b)(1)(i).  Here, the medical evidence cited above warrants a more specific finding by the ALJ as to whether Plaintiff's impairments, individually or in combination, medically equal Listing 1.04A, especially in light of the fact that she did not have a medical expert testify as to such equivalence.  Additional medical evidence shows numerous instances of Plaintiff having an antalgic or spastic gait, decreased ranges of motion in his hip and back, his use of a cane and crutches for walking shorter distances and a wheelchair for longer distances at the recommendations and orders of doctors, decreased toe and heel waking, falls related to weakness in the legs and hips, significant atrophy throughout the lower extremity from hip through thigh, poor to fair rehabilitation potential, and the use of strong narcotic drugs. ECF Dkt. #11 at 340, 357, 409, 417, 422, 426, 430, 436-437, 440, 444, 461, 468, 482, 484, 492-494, 508, 513-520, 553-554, 560, 566, 581, 584, 587, 588, 596, 602, 1031, 1037.  Accordingly, the undersigned recommends that the Court remand the instant case for the ALJ to reconsider, perhaps with the aid of a medical expert, the issue of whether Plaintiff's impairments, individually or in combination, medically equal Listing 1.04A or other closely-related Listings and to provide specific articulation as to her determination of medical equivalence.

## B.        TREATING PHYSICIAN'S OPINION

Plaintiff also asserts that the ALJ erred by failing to defer to the opinions of his treating physician, Dr. Scullin.  ECF Dkt. #13 at 12-13.  The ALJ had reviewed Dr. Scullin's September 17, 2013 medical source statement diagnosing Plaintiff with cervical thoracic myelopathy, low back pain with radiculopathy, neuritis and neuropathy.  *Id*.  She opined Plaintiff's prognosis as poor and noted his pain, and difficulty with ambulation and daily living activities.  *Id*.  She opined that Plaintiff could not walk even a block without rest or severe pain, he could sit and stand for only five minutes for a total of less than two hours per eight-hour workday, he needed a sit/stand option, periods of walking around every five minutes for three minutes each time, and he would have to take unscheduled breaks every half hour for up to twenty minutes due to muscle weakness, pain and chronic fatigue.  *Id*. at 1014.  She indicated that Plaintiff needed a cane due to imbalance, he had pain and weakness, he could never lift any weight, and he could never twist, stoop, bend, crouch, squat, climb stairs or climb ladders.  *Id*. at 1015.  She also opined that Plaintiff would be off task 25% or more and he would be absent more than four days per month due to treatment or his impairments.  *Id*. at 1016.

The ALJ is responsible for resolving conflicts in the evidence and weighing the evidence, including medical source opinions.  *Perales*, 402 U.S. at 399.  An opinion on the nature and severity of a claimant's impairment is entitled to controlling weight, but only when: (1) the source giving the opinion is a "treating source" as defined in the regulations; (2) the opinion is well supported by medically-acceptable clinical and laboratory diagnostic techniques; and (3) the opinion is not inconsistent with other evidence.  20 C.F.R. § 404.1527(d)(2); *Wilson v. Comm'r Social Security Admin.*, 378 F.3d 541, 544 (6th Cir. 2004).  The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001)(citations omitted).

An ALJ must evaluate the factors set forth in 20 C.F.R. §404.1527(d) in determining the

weight to give to doctors' opinions.  20 C.F.R. §404.1527(d).  If the ALJ does not attribute controlling weight to the opinions of a treating source, she must examine the factors under 20 C.F.R.  § 404.1527(d)(2) in order to determine the weight to give to the opinion.  20 C.F.R. § 404.1527(d)(2); *Wilson v.*

*Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004).  These factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*  Moreover, the ALJ must provide good reasons in her decision for rejecting a treating physician's opinion and must provide good reason for the weight that she chose to attribute to that opinion.  20 C.F.R. § 404.1527(d)(2); *Pasco v. Comm'r of Soc. Sec.*, No. 03-4358, 137 Fed.Appx. 828, 837, 2005 WL 1506343 at **7 (6th Cir. June 23, 2005), unpublished.

The undersigned recommends that the Court find that the ALJ did not properly apply the treating physician rule to Dr. Scullin's opinion.  The ALJ stated that she gave "some weight" to Dr. Scullin's opinion as it was "somewhat consistent with the objective evidence of record" which showed reduced strength and range of motion in the spine and lower extremities.  ECF Dkt. #11 at 33.

However, the ALJ did not explain why she chose not to give controlling weight to Dr. Scullin's opinion.  The ALJ concluded that Dr. Scullin's severe limitations for Plaintiff were not supported by her treatment records.  ECF Dkt. #11 at 33.  She noted that while Dr. Scullin indicated that she treated Plaintiff every one to two months since October 2012, Dr. Scullin's treatment records consisted only of a nerve block report and an EMG showing radiculopathy.  *Id*.  While the ALJ is correct that few records from Dr. Scullin are in the record, she did not explain how Dr. Scullin's opinion was not well supported by medically-acceptable clinical and laboratory diagnostic techniques or how the opinion was not inconsistent with other evidence.  20 C.F.R. § 404.1527(d)(2).  Dr. Scullin indicated that she treated Plaintiff since October of 2012 and she was the one who conducted the September 2013

-24-

EMG/nerve conduct studies.  ECF Dkt. #11 at 1016-1017.  She also indicated in her medical source statement that Plaintiff's impairments as demonstrated by signs, clinical findings and test results were reasonably consistent with the symptoms and functional limitations that she opined.  *Id*. at 1020.  The ALJ failed to identify the evidence showing that Dr. Scullin's opinion was not supported and was not inconsistent with the other evidence of record.  Rather, the ALJ just jumped to attributing "some weight" to Dr. Scullin's opinion.

For these reasons, the undersigned recommends that the Court find that the ALJ failed to appropriately apply the treating physician rule to Dr. Scullin's September 17, 2013 opinion.  The undersigned therefore recommends that the Court REVERSE the ALJ's decision and REMAND this case to the ALJ for reconsideration and proper application of the treating physician rule to Dr. Scullin's September 17, 2013 opinion with articulation of the reasoning behind attributing less than controlling weight to Dr. Scullin's opinion should the ALJ again choose to do so.

## VII.    CONCLUSION AND RECOMMENDATION

For the above reasons, the undersigned recommends that the Court VACATE the ALJ's decision and REMAND the instant case for the ALJ to reconsider whether Plaintiff's impairments meet or medically equal Listing 1.04A and to properly apply the treating physician rule to Dr. Scullin's September 17, 2013 opinion.


Dated: July 11, 2016                                   */s/ George J. Limbert*
                                                       GEORGE J. LIMBERT
                                                       UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. L.R. 72.3(b).